UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD R. LEWIS,<br><br>                              Petitioner,<br><br>v.<br><br>KATHLEEN ALLISON, Secretary of the California Department of Corrections and Rehabilitation,<br><br>                              Respondent. | Case No.:  20cv1042-MMA (MSB)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to the United States District Judge Michael M. Anello pursuant to 28 U.S.C.A. § 636(b)(1) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  On June 5, 2020, Petitioner Donald Lewis, a state prisoner proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C.A. § 2254.  (ECF No. 1.)  On June 25, 2020, Petitioner filed his Petition for Writ of Habeas Corpus ("Petition"), and on October 26, 2020, an Amended Petition for Writ of Habeas Corpus ("Amended Petition"), the operative pleading in this case, challenging the validity of his state court conviction for first-degree murder.  (ECF Nos. 3 & 17.)  Respondent filed an Answer to

1  Plaintiff's Amended Petition on July 15, 2021.  (ECF No. 38.)  Petitioner did not file a

2  Traverse, which was due on August 16, 2021.  (See Docket; see also ECF No. 30 at 2.)

3      This Court has considered the Amended Petition, Answer, and all supporting

4  documents filed by the parties.  For the reasons set forth below, this Court

5  **RECOMMENDS** that Petitioner's Amended Petition for Writ of Habeas Corpus be

6  **DENIED**.

7                         **I.  FACTUAL BACKGROUND**

8      The following facts are taken from the California Court of Appeal's opinion in

9  People v. Lewis, Appeal No. D071434.  (See Lodgment 7.)  This Court presumes the state

10  court's factual determinations to be correct, absent clear and convincing evidence to

11  the contrary.  See 28 U.S.C.A. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340

12  (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (findings of historical fact,

13  including inferences properly drawn from such facts, are entitled to statutory

14  presumption of correctness).

15                              Prosecution

16      On August 19, 2015, Lewis was at an apartment complex in El Cajon
    where his then-girlfriend, Erica Howard, lived.  Around 7:00 p.m., Lewis,
17  Howard, James Crawford (Lewis's friend), and at least two other men were
    arguing and yelling outside.  Lewis was hollering.  He pulled out a gun and
18  waived it around "kind of wildly."  The men told Lewis to calm down and
    stated they were just trying to "get wet," a reference to smoking PCP.
19  Howard pled for Lewis to not shoot and asked him to leave.  She pulled his
    arm, but Lewis ignored her.  Lewis, while yelling, pointed his gun at
20  Crawford's chest.  No one was threatening Lewis, and Crawford did not act
    aggressively toward him.
21

22      Everyone except for Crawford fled from the area.  Lewis lowered his
    gun and stared at it.  Crawford walked away, toward an adjacent street,
23  and Lewis followed him.  They stopped in the complex's parking lot.
    Crawford backed away as Lewis pointed his gun at Crawford's chest.
24  Crawford was unarmed and begged for his life.  Lewis fired one bullet into
    Crawford, paused for a few seconds, and then shot him again.  Neighbors
25  who heard the shots called 911.

26

27

28

After shooting Crawford, Lewis fled to an apartment in a nearby complex, where his friend Angelica Villegas resided with her parents. Villegas was not home at the time and did not give permission for Lewis to enter her parents' home. Villegas's stepfather, Ramon Lozano, discovered Lewis half-naked in the shower. When he asked Lewis what he was doing inside of his house, Lewis told him to be quiet. Lozano tried to call 911 and Lewis attempted to grab his phone. Lozano pushed Lewis out of his house. Lewis appeared "not totally normal, like a person that is drugged." Lozano found Lewis's wet underwear and white tank top in his trashcan, which he turned over to police.

Later that evening, Lewis called Villegas and told her there was "something" in her parents' refrigerator. Villegas went to her parents' apartment and found a gun inside of the refrigerator. She later found Lewis's sweater and a bag of bullets in the living room. The gun and ammunition were subsequently turned over to the police.

Two weeks after the murder, Lewis turned himself in to the police. Crawford died at the hospital from his gunshot wounds. Crawford suffered two bullet wounds to his torso. One of the bullets went through his lung and his aortic artery. The other bullet, which was fired when the muzzle of the gun was pressed against Crawford's skin, was lodged in his spine. Crawford's toxicology report showed that his blood alcohol content was .14 and he had 27 nanograms per milliliter of PCP in his system.

<u>Defense</u>

Howard testified that she was in a romantic relationship with Lewis at the time of the shooting. She and Lewis had a child together.

On the day of the shooting, Lewis showed up at her apartment. It had been a day or two since Howard had seen Lewis. Howard believed Lewis was intoxicated on "something else" besides alcohol because his behavior was "a little different." However, Lewis could find Howard's apartment, knew who she was, and was able to sustain a conversation with her.

Later that day, Howard saw Lewis sitting on a cinderblock retaining wall outside her apartment complex. Lewis was with Crawford and three or four other young men. Howard talked to Lewis while he was on the cinderblock retaining wall, but she left to buy beer at a store. When

Howard returned from the store, Lewis still was sitting on the retaining wall.  She gave Lewis a beer and went to her apartment.  At that point, it appeared that the men were socializing.

Howard later saw Lewis hanging out with a group of his friends in the apartment parking lot.  They were drinking beer and passing around a few cigarettes.  Howard could smell PCP and became angry with Lewis.

Howard approached Lewis, and they had a heated conversation.  Lewis did not appear to be in his "right mind."  He was slurring his words, which were "mushing together."  Howard believed Lewis was under the influence of PCP.

Howard walked back to the apartment, and Lewis followed.  Some of the men called out Lewis's nickname (Maceo) in anger.  Lewis walked up the stairs slowly; he appeared sluggish.

After they were inside the apartment, Crawford knocked very loudly on the front door.  As Howard opened the door, Crawford said, "Where the F is Maceo?"  Crawford's demeanor was aggressive, nasty, and very rude.  However, there was no physical altercation, and Crawford did not threaten Howard.  Howard told Crawford to leave, and he did.

Lewis stayed in the apartment for less than 20 minutes before leaving again.  Before he left, Howard and Lewis got into an argument about Lewis's friends, like Crawford, coming to Howard's apartment.  There was "a lot of language" and Howard yelled at Lewis.  They were aggressive toward each other.  Lewis appeared to be upset with Crawford, saying, "I don't like the fact that he [Crawford] keeps knocking on my fucking door[.]"  After making this comment, Lewis left Howard's apartment.  He was "still sort of stumbling" but "clearly able to move and function."  Howard followed about five minutes later.  She dropped her baby off with a neighbor downstairs and headed to where Lewis was standing.

Three men, including Crawford, were standing with Lewis.  Lewis was holding a gun and yelling at the men to "get up out of here."  Howard tried to pull his arm and stop him, but Lewis pushed her away.  At some point, Lewis fired a warning shot up into the air.  The other two men ran, but Crawford stayed.  Crawford walked up to Lewis aggressively, and they got into a "struggle" while Howard yelled for them to stop.  Crawford and Lewis

were throwing punches.  During the struggle, Lewis fired a second shot, which appeared to hit Crawford in his stomach.

Howard ran to her apartment.  She heard, but did not see, the final gunshot.  After the incident, Howard feared for her life, from Lewis and others who might want to retaliate.

In an interview with the police, Howard did not mention a physical altercation between Lewis and Crawford.  She shook her head when police asked her if Crawford was "chipping back and forth" at Lewis.

The defense called two experts [sic] witnesses at trial.  The first, a neuropsychologist, concluded that Lewis had low cognitive functioning because of a brain injury suffered as a young child.  The second, a medical doctor who specializes in pain and addiction, testified that (1) PCP is a dissociative anesthetic that creates a separation of awareness between one's body and surroundings; and (2) symptoms of confusion and agitation can be magnified if the person has a brain injury or simultaneously abuses other substances.

(Lodgment 7 at 3–7.)

## II.  PROCEDURAL BACKGROUND

### A.  Petitioner's Criminal Conviction and Appeals

On October 19, 2016, a San Diego County Superior Court jury convicted Petitioner of first-degree murder, in violation of California Penal Code section 187(a), and found true the allegation that he discharged a firearm, in violation of California Penal Code section 12022.53(d).  (Lodgment 1 at 1.)  On November 17, 2016, the trial judge sentenced Petitioner to a state prison term of fifty years to life, as follows: (1) indeterminate term of twenty-five years to life for the underlying count of murder, and (2) indeterminate term of twenty-five years to life for the firearm enhancement, to run consecutive.  (Id.)

On July 11, 2017, Petitioner appealed his sentence to the California Court of Appeal, raising the following claim:  "The trial court erred by instructing the jury—contrary to the plain language of the Penal Code—that it could not consider evidence of

voluntary intoxication in connection with express malice and imperfect self-defense." (Lodgment 2 at 13.)  On December 15, 2017, Petitioner filed a Supplemental Brief in the California Court of Appeal arguing that "[t]he enactment of Senate Bill 620 require[d] remand so that the trial court may exercise its discretion whether to strike the firearm enhancement."  (Lodgment 5 at 2.)  On March 16, 2018, the state appellate court rejected the instructional error claim, but remanded the matter to the trial court to consider whether Petitioner's firearm enhancement should be stricken in light of then-recent amendments to California's gun use enhancements under section 12022.53(h). (Lodgment 7.)

On April 16, 2018, Petitioner filed a petition for review in the California Supreme Court raising his instructional error claim.  (Lodgment 8.)  The California Supreme Court denied the petition without comment on June 13, 2018.  (Lodgment 9.)

On July 25, 2018, pursuant to the appellate court's order for remand, the trial court held a resentencing hearing and declined to strike the firearm enhancement. (Lodgment 10 at 1–2.)  Petitioner did not appeal the July 25, 2018 sentence and judgment.

**B.  Petitioner's State Habeas Petitions**

On May 7, 2019, Petitioner constructively filed a petition for writ of habeas corpus in the San Diego County Superior Court ("First State Petition"), arguing ineffective assistance of counsel and the instructional error claim he raised on direct appeal.  (Lodgment 11.)  The Superior Court denied the First State Petition on August 9, 2019.  (Lodgment 12.)

On August 23, 2019, Petitioner constructively filed a second habeas petition in the California Court of Appeal ("Second State Petition"), raising the same two claims he raised in his First State Petition.  (Lodgment 13; see also Lodgment 12.)  The state appellate court denied Petitioner's Second State Petition on September 10, 2019. (Lodgment 14.)  Petitioner did not file a habeas petition in the California Supreme Court. / / /

## C.  **Federal Habeas Petition**

Petitioner's federal Petition was constructively filed on May 28, 2020,[1] and docketed on June 25, 2020.  (ECF No. 3 at 23–24.)  On August 25, 2020, Respondent filed a Motion to Dismiss, arguing that the Petition was untimely and contained unexhausted claims.  (ECF No. 11.)  On October 26, 2020, Petitioner constructively filed his Amended Petition, which was docketed on November 5, 2020.  (ECF No. 17.)  In the only remaining claim in the Amended Petition Petitioner asserts that the trial court committed prejudicial error by instructing the jury that it could not consider evidence of voluntary intoxication in connection with express malice or imperfect self-defense.  (See id. at 6–9, 13; see also id. at 24 (Petitioner expressly stating that he "has removed all unexhausted claim[s] in the instant [A]mended Petition.").)

On December 15, 2020, Petitioner moved the Court for leave to file supplemental pleadings seeking to "amend his habeas Petition."  (ECF No. 20 at 1.)  The Court construed Petitioner's request as a motion to file the Amended Petition, and denied the motion as moot because the Amended Petition had already been filed on the docket.  (ECF No. 21.)  The Court further denied as moot Respondent's Motion to Dismiss the original Petition, and ordered Respondent to respond to the Amended Petition.  (Id.)

On January 6, 2021, Respondent filed a Motion to Dismiss the Amended Petition, arguing that the Amended Petition was untimely.  (ECF No. 23.)  On May 17, 2021, the Court issued a Report and Recommendation.  (ECF No. 28.)  The Court found that statutory tolling did not render Petitioner's Amended Petition timely, and further

---

[1]  The Court notes that Petitioner initially sent his "Civil Cover Sheet" and a $5.00 mailing fee to the Court in the envelope dated June 3, 2020.  (ECF No. 1.)  Petitioner, however, did not include his federal habeas petition, and the Court dismissed the action without prejudice on June 16, 2020.  (See id.; see also ECF No. 2.)  Petitioner subsequently mailed to the Court his federal habeas Petition, which was signed on May 28, 2020.  (ECF No. 3 at 23.)  Applying the "mailbox rule," under which a pro se prisoner's petition is deemed filed when the prisoner delivers it to prison authorities for forwarding to the clerk of the court, see Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th Cir. 2003), the Court presumes that Petitioner delivered the Petition to prison authorities on May 28, 2020, the date when the Petition was signed.

development of the record was required to determine whether Petitioner was entitled to equitable tolling.  (Id. at 7–19.)  The Court also found that because Respondent argued for the first time in the Reply that the Court should address the merits of Petitioner's instructional error claim, Petitioner did not have an opportunity to address Respondent's arguments on the merits.  (Id. at 19–20.)  The Court recommended that the District Judge deny Respondent's Motion to Dismiss without prejudice and order Respondent to answer the Amended Petition.  (Id. at 21.)  On June 11, 2021, District Judge Anello issued an order adopting this Court's Report and Recommendation and denying Respondent's Motion to Dismiss without prejudice.  (ECF No. 29.)  Pursuant to the Court's scheduling order, Respondent filed an Answer on July 15, 2021.  (See ECF Nos. 30 & 38.)

### III.  SCOPE OF REVIEW

Title 28 of the United States Code, § 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a).

The instant Petition was filed after April 24, 1996, and therefore it is subject to the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub.L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C.A. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405–06 (2000). A state court's decision is an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal rule [from Supreme Court decisions] . . . but unreasonably applies [that rule] to the facts of the particular state prisoner's case." White v. Woodall, 572 U.S. 415, 425 (2014) (quoting Williams, 529 U.S. at 407–08). In deciding a state prisoner's habeas petition, a reviewing federal court need not decide whether the state court applied clearly established federal law erroneously or incorrectly; rather a federal court applies an extraordinarily deferential review, inquiring only whether the state court's decision was "objectively unreasonable." See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

When a state supreme court does not provide any explanation for its decision, the reviewing federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); see also Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991) (providing that a reviewing federal court may look through to the last reasoned state court

9

1   decision).  Where a state court summarily denied a claim, a presumption exists that the

2   state court adjudicated the claim on the merits, unless "there is reason to think some

3   other explanation for the state court's decision is more likely."  Harrington v. Richter,

4   562 U.S. 86, 99–100 (2011).  If the state court provided no explanation for its decision, a

5   reviewing federal court "must determine what arguments or theories supported or . . .

6   could have supported, the state court's decision; and then it must ask whether it is

7   possible fairminded jurists could disagree that those arguments or theories are

8   inconsistent with the holding in a prior decision of [the Supreme] Court."  Id. at 102.

9        Habeas relief is also available where the state court's adjudication of a claim

10  "resulted in a decision that was based on an unreasonable determination of the facts in

11  light of the evidence presented in the [s]tate court proceeding."  28 U.S.C.A.

12  § 2254(d)(2); see also Wood v. Allen, 558 U.S. 290, 293 (2010).  Federal habeas courts

13  give deference to a state court's application of state law and interpretation of the facts.

14  See Estelle v. Maguire, 502 U.S. 62, 67–68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780–81

15  (1990).  A reviewing federal court will not overturn a state court's decision on factual

16  grounds unless the federal court finds that the state court's factual determinations were

17  objectively unreasonable in light of the evidence presented in state court.  See Miller-El,

18  537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341–42 (2006) (the fact that

19  "[r]easonable minds reviewing the record might disagree" does not render a decision

20  objectively unreasonable).  This Court will presume that the state court's factual findings

21  are correct, and Petitioner may overcome that presumption only by clear and

22  convincing evidence.  See 28 U.S.C.A. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465,

23  473–74 (2007).

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

20cv1042-MMA (MSB)

# IV.  DISCUSSION

Petitioner argues that he is entitled to equitable tolling, the Amended Petition is timely, and the Court should decide the Amended Petition on the merits.  (See ECF No. 17 at 20–24.)  Petitioner further claims that the trial court committed prejudicial error by improperly instructing the jury that it could not consider evidence of his voluntary intoxication in deciding the issues of express malice and imperfect self-defense.  (Id. at 6, 13.)  Specifically, Petitioner contends that the jury should have been permitted to consider his voluntary intoxication in support of imperfect self-defense theory he presented at trial—that he unreasonably believed he needed to defend himself.  (See id.; see also Lodgment 2 at 13–27.)

Respondent maintains that Petitioner failed to establish that he is entitled to equitable tolling and the Amended Petition is untimely.  (See ECF No. 38-1 at 2, 14.) Respondent also "recognizes that it is likely easier to dispose of [the Amended] Petition on the merits" and "raises the untimeliness argument . . . to preserve the issue should it become dispositive."  (Id. at 14.)  Respondent further asserts that Petitioner's instructional error claim does not allege a federal constitutional violation for which federal habeas relief is available.  (See id. at 11–13.)  Respondent also argues that under California law, evidence of voluntary intoxication is not admissible to support imperfect self-defense, and under clearly established U.S. Supreme Court authority, Petitioner cannot show that such rule is unconstitutional because the Court expressly upheld such a limiting rule adopted by another state.  (Id. at 6.)  Respondent therefore asks the Court to deny Petitioner's Amended Petition.  (Id. at 6, 15.)

## A.  Timeliness of the Amended Petition

The AEDPA statute of limitations is not jurisdictional, and in the interest of judicial economy, courts may address the merits of the federal habeas petition without resolving the issue of timeliness.  See Day v. McDonough, 547 U.S. 198, 205–06, 210 (2006) (quoting Granberry v. Greer, 481 U.S. 129, 136 (1987)) (statute of limitations is not jurisdictional and district courts may "determine whether the interests of justice

would be better served" by dismissing petition as time-barred or addressing the merits of the petition); Van Buskirk v. Baldwin, 265 F.3d 1080, 1083 (9th Cir. 2001) (district courts may address federal habeas petition on the merits rather than "reach the complex questions lurking in the time bar of the AEDPA"); Damian v. Vaughn, 186 F. App'x 775, 777 n.1 (9th Cir. 2006) (quoting Trussell v. Bowersox, 447 F.3d 588, 590 (8th Cir. 2006)) ("[B]ecause neither the statute of limitations nor procedural default constitutes a jurisdictional bar to our review, Day v. McDonough, 547 U.S. 198, 126 S.Ct. 1675, 1681–82, 164 L.Ed.2d 376 (2006), we shall, in the interest of judicial economy, proceed to the merits of [petitioner's] petition.").  District courts, including this Court, have applied the same rationale to a variety of habeas claims.  See Blanco v. Robertson, Case No.: 18cv1909 CAB (AGS), 2020 WL 2542863, at *8, *11–14 (S.D. Cal. May 19, 2020) (finding it "unnecessary to reach a definitive conclusion" on the issue of timeliness of the federal habeas petition, where the sole claim in the petition failed on the merits); Schessler v. McDonald, Case No. CV 11-9077-AB (JEM), 2015 WL 10582201, at *1 n.1 (C.D. Cal. Nov. 2, 2015) (finding that the interests of judicial economy warranted addressing the merits of petitioner's federal habeas claims without resolving the issue of timeliness of the petition); Goodlow v. Gipson, No. CV 13–1417–CJC MAN, 2015 WL 1909714, at *5 n.2 (C.D. Cal. Mar. 13, 2015) (addressing the merits of petitioner's federal habeas claims in the interest of judicial economy without resolving the timeliness issue, where respondent argued that several of petitioner's claims were barred by the AEDPA statute of limitations); Alvarez v. Smalls, No. EDCV 08-1512-AG (MLG), 2009 WL 1220529, at *1 n.1 (C.D. Cal. Apr. 30, 2009) (addressing the merits of petitioner's federal habeas claims in the interest of judicial economy, where "[t]he pleadings le[ft] open the question of whether [p]etitioner [wa]s entitled to equitable tolling of the limitations period.").

In this case, judicial economy will be best served by reaching the substance of Petitioner's sole federal claim in the Amended Petition without determining whether Petitioner is entitled to equitable tolling in light of his alleged mental impairments, and

1  whether his Amended Petition is timely.  Accordingly, the Court will consider the claim

2  on the merits.

3      **B.  Merits of the Amended Petition**

4      Petitioner argues that the trial court erred by improperly instructing the jury that

5  it could not consider evidence of Petitioner's voluntary intoxication in connection with

6  express malice or imperfect self-defense.  (ECF No. 17 at 6, 13.)  Petitioner contends he

7  was precluded from arguing that his intoxication caused him to unreasonably believe

8  that he had to use deadly force, and from showing reasonable doubt on the element of

9  express malice; and the trial court's instructional error prejudiced him because it

10  undermined his strongest defense to murder.  (See id.; see also Lodgment 2 at 6.)

11      Petitioner presented his instructional error claim to the California Supreme Court

12  in a petition for review, which was summarily denied without a statement or reasoning

13  or citation of authority.  (See Lodgments 8 & 9.)  Petitioner presented this claim to the

14  California Court of Appeal.  (See Lodgment 13.)  The state appellate court denied the

15  claim in a reasoned opinion.  (See Lodgment 7.)  The Court will therefore look through

16  the silent denial by the state supreme court to the appellate court's opinion.  See

17  Wilson, 138 S. Ct. at 1192; Ylst, 501 U.S. at 804 n.3.

18      The California Court of Appeal affirmed the trial court's judgment and stated the

19  following:

20      Lewis appeals, contending the court improperly instructed the jury
21      under CALCRIM No. 625 because that instruction did not allow the jury to
        consider evidence of Lewis's voluntary intoxication to support his defense
22      of imperfect self-defense.  We reject this contention.  Whether CALCRIM
        No. 625 improperly precludes a jury from considering voluntary intoxication
23      with respect to imperfect self-defense is currently before the California
        Supreme Court in People v. Soto (2016) 248 Cal. App. 4th 884, review
24      granted October 12, 2016, S236164 (Soto).  Assuming without deciding that
        CALCRIM No. 625 is incorrect as Lewis asserts, on this record, any such
25      error is harmless.  Thus, we affirm Lewis's conviction.
26
27      . . . .
28

Lewis has not established a reasonable probability that he would have obtained a more favorable result had the jury been instructed that it could consider voluntary intoxication in deciding whether Lewis harbored express malice.  We acknowledge that although the evidence was not conclusive regarding whether Lewis was voluntarily intoxicated during the shooting, the jury reasonably could have reached that conclusion based on Howard's testimony that she believed Lewis was intoxicated because his behavior was "a little different."  In addition, Lewis was seen with other men, drinking beer and smoking cigarettes.  Howard also testified that she could smell PCP and believed Lewis was under the influence of PCP.  Further, during his case-in-chief, Lewis offered the opinion of a medical doctor who testified that PCP is a dissociative anesthetic that creates a separation between one's body and surroundings.  That doctor, nevertheless, did not testify that Lewis had ingested PCP before the shooting and admitted that he was not given any of Lewis's blood testing to review.

Lacking in this testimony, however, is any evidence regarding how many beers Lewis drank or the amount of PCP he ingested if any.[2]  Moreover, there is no testimony regarding what Lewis "actually believed" during his altercation with Crawford.  Indeed, during Lewis's case-in-chief, he presented only one witness, Howard, his girlfriend, who testified about a physical altercation between Crawford and Lewis.  She testified that, after Lewis fired a warning shot [sic] into the air, Crawford aggressively walked toward Lewis, and they got into a struggle, throwing punches at each other.  According to Howard, during this struggle, Lewis shot Crawford in the stomach.[3]

In contrast, the prosecutor presented multiple witnesses who testified that they did not see any physical altercation.  For example, neighbors witnessed Crawford retreat toward an adjacent street and Lewis follow him.  Multiple witnesses testified that they saw Crawford either standing still or backing away from Lewis in the moments before Lewis shot him.  They also did not see Crawford with a weapon or act aggressively

---

[2]  To the contrary, Crawford's toxicology report showed that his blood alcohol content was .14 and he had 27 nanograms per milliliter of PCP in his system.

[3]  Howard's trial testimony was different than what she previously told the police after the incident.  For example, she did not mention any physical altercation between Lewis and Crawford during any of her police interviews.

1   toward Lewis.  In fact, there was evidence that Crawford was begging for
2   his life.  Thus, the prosecution offered voluminous evidence that there was
    no threat of imminent danger that would make Lewis sincerely believe the
3   use of deadly force was necessary to defend himself.

4           Further, in the moments following the shooting, Lewis attempted to
5   destroy any evidence on him that linked him to the murder.  He fled to his
    friend's residence nearby, where he showered, discarded his clothing, hid
6   his gun, and stashed his bag of ammunition.  Lewis also told Lozano to be
7   quiet when he was yelling at him, and he tried to grab Lozano's phone
    when he attempted to call 911.  This evidence reasonably shed doubt on
8   the impact of any intoxication as well as any belief that he was in imminent
9   danger or that the use of deadly force was necessary to defend against that
10  danger.

11          In short, we conclude that "the evidence supporting the existing
12  judgment is so relatively strong, and the evidence supporting a different
    outcome is so comparatively weak, that there is no reasonable probability
13  the error of which the defendant complains affected the result."
14  (Breverman, supra, 19 Cal. 4th at p. 177; italics omitted.)  Moreover, our
    conclusion is buttressed by the fact that the jury convicted Lewis of first
15  degree murder, and in doing so, found beyond a reasonable doubt that
16  Lewis premeditated and deliberated.  Such a finding is inconsistent with the
    theory of imperfect self-defense.  (People v. Manriquez (2005) 37 Cal. 4th
17  547, 582; see People v. Lewis (2001) 25 Cal. 4th 610, 646 ["Error in failing to
18  instruct the jury on a lesser included offense is harmless when the jury
    necessarily decides the factual questions posed by the omitted instructions
19  adversely to defendant under other properly given instructions."].)  As
20  such, any error associated with the giving of CALCRIM No. 625 is harmless.

21  (Lodgment 7 at 2, 16–18 (footnotes in the original[4]).)

22          To the extent that Petitioner alleges that the state trial court violated state law

23  when it instructed the jury that it could not consider evidence of voluntary intoxication

24  in deciding the issues of express malice and imperfect self-defense, the claim is not

25  subject to federal habeas review.  Estelle, 502 U.S. at 67–68 (citations omitted) ("We

26  have stated many times that 'federal habeas corpus relief does not lie for errors of state

27  _____

28  [4]  The Court changed the numbering of the quoted footnotes to maintain consecutive footnote
     numbering in this Report and Recommendation.

1    law.' . . . [I]t is not the province of a federal habeas court to reexamine state-court

2    determinations on state-law questions.").  "Federal habeas courts . . . do not grant

3    relief, as might a state appellate court, simply because [an] instruction may have been

4    deficient in comparison to the CALJIC [California Jury Instructions– Criminal][5] model."

5    Id. at 72.  "In conducting habeas review, a federal court is limited to deciding whether a

6    conviction violated the Constitution, laws, or treaties of the United States."  Id. at 68;

7    see also 28 U.S.C.A. § 2254(a); Hernandez v. Ylst, 930 F.2d 714, 719 (9th Cir. 1991) (a

8    petitioner must allege that the state court violated his or her federal constitutional

9    rights for a claim to be cognizable on federal habeas corpus review).

10          To the extent that Petitioner contends that the trial court's alleged failure to

11   properly instruct the jury on how it may consider voluntary intoxication in deciding the

12   issues of express malice and imperfect self-defense violated his federal constitutional

13   rights, the Court will consider the claim.  Under certain circumstances, a district court

14   can find reversible error in the state court's instructions.  "Under the Due Process Clause

15   of the Fourteenth Amendment, criminal prosecutions must comport with prevailing

16   notions of fundamental fairness . . . [which] require that criminal defendants be

17   afforded a meaningful opportunity to present a complete defense."  Bradley v. Duncan,

18   315 F.3d 1091, 1098–99 (9th Cir. 2002) (citing California v. Trombetta, 467 U.S. 479, 485

19   (1984)); see also Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quotation omitted)

20   (state court's jury instructions violate due process if they deny the criminal defendant a

21   "meaningful opportunity to present a complete defense").  "When habeas is sought

22   under 28 U.S.C.A. § 2254, '[f]ailure to instruct on the defense theory of the case is

23   reversible error if the theory is legally sound and evidence in the case makes it

24   applicable.'"  Clark, 450 F.3d at 904–05 (quotation omitted).

---

[5]  "In 2005, the Judicial Council of California adopted the CALCRIM; pursuant to Rule 2.1050 of the California Rules of Court, CALCRIM 'are the official instructions for use in the state of California.'" United States v. Vidal, 504 F.3d 1072, 1084 n.20 (9th Cir. 2007).

"A habeas petitioner must show that the alleged instructional error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 905 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  As a result, the burden on a habeas petitioner is heavy and the issue to be examined is whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Clark, 450 F.3d at 904.

During Petitioner's trial, defense counsel specifically requested the trial court to give instructions on voluntary intoxication, CALCRIM Nos. 625 and 626.  (Lodgment 16 at 1042.)  The trial judge instructed the jury regarding first and second-degree murder, voluntary manslaughter-heat of passion, self-defense, and imperfect self-defense.  (See Lodgment 7 at 8.)  After instructing the jury regarding imperfect self-defense, the trial judge gave instruction under CALCRIM No. 625, stating in relevant part:

> You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted.
>
> A person is voluntarily intoxicated if he becomes intoxicated by willingly using an intoxicating drug, drink, or other substances, knowing it can produce an intoxicating effect, or willingly assuming the risk of that effect.
>
> You may not consider evidence of voluntary intoxication for any other purpose.

(Lodgment 16 at 1090.)  The trial court further instructed the jury under CALCRIM No. 626 as follows:

> Voluntary intoxication may case a person to be unconscious of his or her actions.  A very intoxicated person may still be capable of physical movement, but not be aware of his or her actions or the nature of those actions.

17

> A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using an intoxicating drug, drink, or other substance, knowing that it can produce an intoxicating effect, or willingly assuming the risk of that effect.

> When a person voluntarily causes his or her own intoxication to the point of unconsciousness, that person assumes the risk that while unconscious he or she will commit an act inherently dangerous to human life.  If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

(Id. at 1040–42.)

The jury found Petitioner guilty of first-degree murder, in violation of California Penal Code section 187(a).  (Lodgment 1 at 1.)  California Penal Code section 187(a) defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought."  Cal. Pen. Code § 187(a).  Malice aforethought may be either express or implied.  People v. Elmore, 59 Cal. 4th 121, 132 (2014) (citing Cal. Pen. Code § 188).  Express malice is defined as "a deliberate intention unlawfully to take away the life of a fellow creature."  Cal. Pen. Code § 189(a)(1).  "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  Cal. Pen. Code § 189(a)(2); see also Elmore, 59 Cal. 4th at 133 ("Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger.").

"[I]mperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death."  People v. Simon, 1 Cal. 5th 98, 132 (2016).  Imperfect self-defense negates express malice, the mental state necessary for murder, and can reduce a murder charge to manslaughter.  See People v. McCoy, 25 Cal. 4th 1111, 1116 (2001) ("If a person kills . . . in the unreasonable but good faith belief in having to act in self-defense, the

belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter . . . , not murder.").

In this case, Petitioner presented an imperfect self-defense theory during his trial—that he had taken PCP, "a dissociative anesthetic," as well as alcohol, and was intoxicated at the time of the murder.  (Lodgment 7 at 16; see also Lodgment 16 at 1173–75.)  In Montana v. Egelhoff, 518 U.S. 37 (1996), the Supreme Court, in a plurality opinion, upheld a Montana statute providing that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense."  Id. at 39–40.  The Court held that the state statute did not violate due process.[6]  Id. at 56.

States, including California, have relied on Egelhoff to reject due process attacks on similar state statutes.  See People v. Soto, 4 Cal. 5th 968 (2018); see also id. at 980–81 (listing California cases relying primarily on Egelhoff).  In Soto, the California Supreme Court considered whether California Penal Code section 29.4[7] permitted evidence of

---

[6]  Justice Ginsburg concurred in upholding the state statute at issue and declared that "'[a] state legislature certainly has the authority to identify the elements of the offenses it wishes to punish,' . . . and to exclude evidence irrelevant to the crime it has defined."  Id. at 57.  She further stated that "[d]efining mens rea to eliminate the exculpatory value of voluntary intoxication does not offend a 'fundamental principle of justice[.]'"  Id. at 58–59.

[7]  California Penal Code section 29.4(a) provides the following:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

Id.  California Penal Code section 29.4(b) further provides a limited exception to this rule:  "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."  Id.  California Penal Code section "29.4 prohibits the use of evidence of voluntary intoxication to establish that a defendant acted without implied malice."  Soto, 4 Cal. 5th at 975; see also People v. Martin, 78 Cal. App. 4th 1107, 1114 (2000) ("[E]vidence of voluntary intoxication [is inadmissible] to negate implied malice aforethought.").

20cv1042-MMA (MSB)

1    voluntary intoxication on the question of whether a defendant believed it was necessary

2    to act in self-defense, and concluded that such evidence was not admissible on this

3    question.  Soto, 4 Cal. 5th at 970.  The California Supreme Court held that a criminal

4    defendant has no due process right to the admission of voluntary intoxication evidence

5    on the question of imperfect self-defense.  Id. at 981–92.  The state Supreme Court

6    specifically found that "CALCRIM No. 625 correctly permits the jury to consider evidence

7    of voluntary intoxication on the question of whether defendant intended to kill but not

8    on the question of whether he believed he needed to act in self-defense."  Id. at 970.

9         "[T]he clearly established federal law from Egelhoff is that there is generally no

10   due process violation where a state defines a criminal offense in a way that excludes

11   certain relevant evidence."  Najera v. Sherman, Case No. 15-cv-02444-BAS-JLB, 2017 WL

12   1354782, at *4 (S.D. Cal. Apr. 7, 2017).  "Relying on Egelhoff, courts routinely reject

13   challenges . . . aimed at a trial court's decision to limit a jury's ability to consider

14   evidence of a defendant's voluntary intoxication to establish a defense to a charged

15   crime."  Murphy v. Cueva, No. ED CV 20-1522-JAK (PLA), 2021 WL 4067264, at *13 (C.D.

16   Cal. May 28, 2021) (emphasis added) (citing Wolfe v. Hill, Case No. 8:19-cv-01312-DMG

17   (GJS), 2020 WL 7872127, at *20–21 (C.D. Cal. Aug. 31, 2020) (rejecting the claim that

18   California Penal Code section 29.4(b) violated petitioner's right to due process because

19   it prohibited the jury from considering petitioner's voluntary intoxication to negate

20   implied malice); Trujillo v. California, Case No. SA CV 15-727-DOC (SP), 2018 WL

21   3855144, at *15 (C.D. Cal. June 15, 2018) (rejecting the same challenge to precursor to

22   California Penal Code section 29.4)).  Similarly, in this case, the trial court did not violate

23   Petitioner's right to due process by instructing the jury under CALCRIM No. 625, which

24   did not allow the jury to consider evidence of Petitioner's voluntary intoxication to

25   determine whether he acted in imperfect self-defense.  See Murray v. Schriro, 882 F.3d

26   778, 811 (9th Cir. 2018) (citing Egelhoff, 518 U.S. at 51, 56) ("Due process does not

27

28

20cv1042-MMA (MSB)

require the jury to be instructed regarding the defendant's intoxication at the time of the crime."); see also Murphy, 2021 WL 4067264, at *13 (finding that "petitioner did not have a due process right to have the jury consider his voluntary intoxication to prove perfect or imperfect self[-]defense"); Weaver v. Johnson, No. CV 18-10511-FMO (KS), 2020 WL 3684466, at *10 (C.D. Cal. June 16, 2020) (finding that the trial court did not violate petitioner's right to due process by giving an instruction that precluded the jury from considering evidence of petitioner's voluntary intoxication to decide whether petitioner had acted in imperfect self-defense).

Further, even if Petitioner had a right to the broader instruction on voluntary intoxication at the time of his trial, the trial court's failure to give the instruction did not so infect the entire trial that Petitioner's conviction violated due process.  Petitioner presented an imperfect self-defense theory during his trial—that intoxication caused him to unreasonably perceive a serious harm from the victim.  Defense counsel argued that Petitioner was not guilty of first degree murder because PCP affected his ability to premeditate and deliberate the shooting of Crawford, and Petitioner was defending himself "in a sudden quarrel and heat of passion" after being provoked by the physical altercation with Crawford.  (Lodgment 16 at 1173–75, 1178.)  In support of this theory, Petitioner's counsel called two expert witnesses.  The first witness, Dr. Boyd, a neuropsychologist, testified that Petitioner had low cognitive functioning as a result of a serious brain injury he sustained during early childhood.  (Lodgment 15 at 894, 896, 916.)  Petitioner's counsel also called Dr. Smith, a medical doctor specializing in pain and addiction, who testified that PCP's side effects include confusion and agitation, PCP causes a separation in awareness of one's body and surroundings, and a person's perception of reality could be more impaired if that person has a brain injury. (Lodgment 16 at 999–1000, 1002–05, 1009.)

The prosecution argued that Petitioner killed Crawford with premeditation and deliberation; Petitioner's actions were not justified by complete self-defense, imperfect self-defense, voluntary intoxication, or provocation; and there was no evidence showing

that Petitioner killed Crawford because Petitioner feared for his life. (Id. at 1150–55, 1157–58.)  The prosecution presented evidence that Petitioner pointed his gun at Crawford, and Crawford was seen retreating toward the adjacent street, while Petitioner followed him.  (Id. at 320–21, 361.)  Witnesses testified that Crawford was either standing still or backing away from Petitioner moments before Petitioner repeatedly shot him, and Crawford was begging for his life.  (Id. at 326, 356, 362, 404, 408.)  Further, the prosecution presented evidence that after the shooting, Petitioner attempted to destroy incriminating evidence.  (Id. at 671, 687–88, 733, 736–40, 742, 744.)

The trial judge instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter-heat of passion, self-defense, and imperfect self-defense, and the jury convicted Petitioner of first-degree murder.  (See Lodgment 1 at 1; Lodgment 7 at 8.)  Because the jury convicted Petitioner of first degree murder, the jury found beyond a reasonable doubt that Petitioner premediated and deliberated, and such finding is inconsistent with the theory of imperfect self-defense.  Given the context of the instructions and the trial record in this case, there is no reasonable basis to assume that a jury would have found that Petitioner genuinely believed that he needed to defend himself from Crawford, even if voluntarily intoxicated.  Accordingly, the trial court's alleged error was harmless because there was no substantial or injurious influence on the jury's verdict.  See Murphy, 2021 WL 4067264, at *14 (finding no prejudice and denying petitioner's instructional error claim, where petitioner argued that the trial court erred by precluding the jury from considering his voluntary intoxication in determining whether he acted in self-defense; noting that "the jury considered petitioner's voluntary intoxication to determine, among other things, whether he harbored the intent to kill and whether he acted with premeditation and deliberation," and the jury found petitioner guilty of attempted murder and that he acted with premeditation and deliberation.); Weaver, 2020 WL 3684466, at *10 (finding no prejudice and denying petitioner's instructional error claim, where the trial court

gave a limiting instruction that precluded the jury from considering evidence of petitioner's voluntary intoxication in determining whether he acted in imperfect self-defense; concluding that the "evidence of [p]etitioner's voluntary intoxication did not support his claim that he genuinely but unreasonably believed he needed to shoot the victim in self-defense."); Gil v. Peery, Case No. CV 15-03151-KK, 2015 WL 5706328, at *6 (C.D. Cal. Sept. 29, 2015) (finding no prejudice and denying petitioner's instructional error claim; reasoning that "it was not objectively unreasonable for the state court to conclude the jury would have convicted Petitioner even if instructed with CALCRIM No. 625 regarding voluntary intoxication, based on strong evidence Petitioner had the requisite mental state for first degree murder."); Williams v. Harris, Case No. 14-cv-00101-EMC, 2020 WL 7056023, at *11, *15 (N.D. Cal. Dec. 2, 2020) (finding no prejudice and denying petitioner's instructional error claim, where the trial court instructed the jury under CALCRIM No. 625; reasoning that the instruction provided the jury with an opportunity to find that petitioner's intoxication prevented him from forming an intent to kill or commit a robbery, and the jury found that intoxication did not negate petitioner's intent.).

The trial court's jury instruction therefore did not "so infect[] the entire trial that the resulting conviction violates due process." See Estelle, 502 U.S. at 72. Accordingly, the California Court of Appeal's denial of the Petitioner's jury instruction claim was neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C.A. § 2254(d)(1). Further, based on review of the entire record, the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. See 28 U.S.C.A. § 2254(d)(2). The Court therefore **RECOMMENDS** that Petitioner's sole claim for relief in the Amended Petition be **DENIED**.

///

///

///

## V.  CONCLUSION AND RECOMMENDATION

For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order:  (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Amended Petition.

**IT IS HEREBY ORDERED** that no later than **April 25, 2022**, any party to this action may file written objections with this Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 2, 2022**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:  March 21, 2022

Honorable Michael S. Berg
United States Magistrate Judge

20cv1042-MMA (MSB)